UNITED STATES DISTRICT COURT      **JURY TRIAL DEMANDED**
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
MEDIA TENOR INTERNATIONAL AG,
and MEDIA TENOR LTD.

                 **AMENDED COMPLAINT**

            Plaintiffs,

    -against-                13 Civ. 07223 (DLC)(JCF)

MEDCO HEALTH SOLUTIONS, INC.,

            Defendant.
-----------------------------------------------------x

Plaintiffs Media Tenor International AG ("Media Tenor") and Media Tenor Ltd. ("MTL"), by and through undersigned counsel, and pursuant to Judge Cote's Order dated November 25, 2013, as and for an Amended Complaint against Defendant, Medco Health Solutions, Inc. ("Medco"), allege as follows:

1. This action arises from media analysis services performed for Defendant Medco in 2009 and 2010, for which Medco has not paid in full. Medco has not paid any of the sums sought herein, despite the fact that Medco has admitted in writing that all of the claimed sums are owed.

## JURISDICTION AND VENUE

2. Subject matter jurisdiction is proper in this matter pursuant to 28 U.S.C. § 1332(a) – diversity of citizenship.

3. Media Tenor is a Swiss corporation (in German "AG"), with its principal place of business in Rapperswil Lake Zurich, Switzerland. Its CEO is Roland Schatz, a Swiss citizen.

4. Media Tenor Ltd. is a New York corporation with its principal place of business at 515 Madison Avenue, Suite 1600, New York, New York.

1

5. Medco is a Delaware corporation with its principal place of business in Franklin Lakes, New Jersey.

6. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7. Personal jurisdiction over Medco is proper because in the Professional Services Agreement between Media Tenor and Medco, signed on January 21, 2010, and attached hereto as **Exhibit A** (the "Agreement"), the parties chose to be governed by New York law. See **Exhibit A** at section 13. Section 13 of the Agreement states: "This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York regardless of the conflicts of laws principles thereof."

8. The New York choice of law clause at section 13, is present under the heading "Section 13. Applicable Law and Forum." This heading (using the term "Forum"), demonstrates that the parties consented to personal jurisdiction in New York. The fact that the term "Forum" appears in section 13's heading, but not in the subsequent text, is most reasonably interpreted as a typographical error or a simple drafting oversight.

9. Moreover, section 13 of the Agreement states: "This Agreement *shall* be governed by and construed *and enforced* in accordance with the laws of the State of New York regardless of the conflicts of laws principles thereof." Emphasis added. The clause "shall be … enforced" makes it clear that the parties agreed to litigate all future disputes in New York. The clause "and enforced" signifies that the future prevailing party would necessarily be using New York's CPLR Article 52 judgment enforcement provisions. It therefore follows that that the prevailing party will have obtained a judgment from a court in New York.

10. Personal jurisdiction over Medco is also proper because Medco is authorized to do business in New York, and has a New York registered agent. Medco is a pharmacy benefits manager serving more than 65 million members in the United States.

11. Medco regularly does business in the State of New York because, among other things, it is one of the major pharmacy benefit managers for employers and insurers in New York State.

12. Personal jurisdiction is also proper over Medco because, pursuant to CPLR 302(a)(1), the cause of action described herein arose from Medco's transaction of business within New York State.

13. Much of the work, and over 20 meetings between Media Tenor and Medco, took place in Manhattan. More case-specific activity took place in New York than in any other state. Other meetings between the parties took place in Brussels, Washington D.C., Minneapolis, Berlin and Zurich.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District, namely New York County. These events, also described above, included over 20 meetings between Medco and Media Tenor in New York County.

## PARTIES

15. Media Tenor is a global media research and analysis company serving blue chip companies, NGOs, governments, the media, and major universities. Acting as a strategic partner, Media Tenor, with its unique data analysis, systematically reviews the past media environment concerning a client, and then assists the client in developing the best possible future media presence.

16. MTL is Media Tenor's New York subsidiary.

17. On July 20, 2011, Medco entered into a Merger Agreement with Express Scripts, Inc., and certain of its subsidiaries, providing for the combination of Express Scripts, Inc. and Medco under a new holding company. The merger was finalized in April 2012.

18. The new, post-merger holding company is Express Scripts Holding Company, a Delaware corporation with its principal place of business in St. Louis Missouri.

19. Express Scripts Holding Company is publicly traded on the NASDAQ. Its symbol is ESRX.

20. Medco is, and has been since April 2012, a wholly-owned subsidiary of Express Scripts Holding Company.

21. According to documents recently filed with the SEC by Express Scripts Holding Company: (1) Medco is an active, wholly-owned subsidiary of Express Scripts Holding Company, and (2) Medco, as of June 30, 2013, had total assets of $41.96 billion.

## FACTS

22. On November 5, 2009, Roland Schatz, the CEO of Plaintiff Media Tenor participated on a conference call with, among others, Barbara Cosgriff, an officer of Defendant Medco. Ms. Cosgriff was Medco's Senior Vice President, Public Policy and External Affairs. Her office was in Washington D.C. Also present on the conference call was Terry Snell, a Government Relations Advisor at King & Spalding in Washington D.C.

23. Prior to November 2009, Roland Schatz and Barbara Cosgriff had known each other for some time. Prior to working at Medco, Ms. Cosgriff was employed at Deloitte. Prior to November 2009, Plaintiff Media Tenor completed a media analysis project for Deloitte.

4

Both Mr. Schatz and Ms. Cosgriff spent a great deal of time working jointly on Media Tenor's Deloitte project.

24. The purpose of the November 5 conference call was to discuss how Media Tenor could help Medco grow its business in Europe. Part of the call concerned how senior Medco officers and consultants could be able to present their concerns already at Media Tenor's Agenda Setting Conference, which was to take place three weeks later (November 18-20, 2009). As Medco's team was as yet unfamiliar with the details of Media Tenor's research methods, another part of the conference call concerned how to familiarize Medco's team with Media Tenor's research methods and the Media Tenor Network.

25. On the November 5 conference call, it was also agreed that Media Tenor would assist Medco in enhancing Medco's European reputation by arranging for Ms. Cosgriff's attendance at the January 2010 World Economic Forum in Davos, Switzerland. At Davos, Plaintiff Media Tenor agreed to introduce Ms. Cosgriff to Media Tenor's business and media contacts attending the Davos Forum.

26. On November 5, Mr. Schatz also sent background information documents concerning Media Tenor to Ms. Cosgriff. On November 6, she then forwarded the Media Tenor information to various Medco executives, including Christian Dierks, Medco's German legal consultant, and Gregory Jones, an in-house attorney at Medco. Mr. Schatz was cc'd on the email.

### Pricing For the Contemplated Services

27. On November 6, 2009, Roland Schatz emailed Barbara Cosgriff concerning Media Tenor's strategic work and its fees for such work. The November 6, 2009 email states that a "Status Quo Analysis" covering Europe would cost €17,500 per month of analysis.

28. The Agenda Setting Conference took place November 18-20, 2009, in Lake Zurich, Switzerland. Prior to the Agenda Setting Conference, Roland Schatz emailed Barbara Cosgriff a November 11, 2009 letter. In the letter, Mr. Schatz states that in order to best assist its clients in cultivating a positive media presence, Media Tenor usually performs a Status Quo Analysis that carefully reviews how the client was actually portrayed in various media in the prior year. The November 11 letter then lays out in detail the pricing of a Status Quo Analysis. Like Mr. Schatz's email of November 6, the letter states specifically that a Status Quo Analysis covering Europe would cost €17,500 per month of analysis. Media Tenor's November 11, 2009 letter to Medco is attached as **Exhibit B**. In the letter, Mr. Schatz further stated that the results of the Status Quo Analysis would be presented to Medco no later than 3 weeks after the signing of the Professional Services Agreement being contemplated by the parties. See **Exhibit B** at page 2.

29. Ms. Cosgriff had to cancel her participation in Switzerland on last minute notice, but at her direction, a Medco delegation attended the November 18-20 Agenda Setting Conference in Switzerland. Present, among others, was Christian Dierks, Medco's German legal consultant. The purpose of the Conference was to make sure that Medco officers and consultants understood Media Tenor's media analysis services. Ms. Cosgriff was already familiar with Media Tenor's services, from her previous time at Deloitte. At the November 18-20, 2009 Agenda Setting Conference, Media Tenor explained its media analysis methodology to the various Medco officers and consultants present, and also described, in detail, the pricing for the work.

30. In November 2009, Media Tenor began its codebook planning for the Medco project, as it was clear that Medco desired a Status Quo Analysis. Moreover, Ms. Cosgriff and Mr.

Schatz already agreed to attend the Davos Forum in January 2010, and Mr. Schatz wanted Ms. Cosgriff to see some preliminary data.

## Media Tenor's Work Absent a Signed Agreement

31. On December 16, 2009, Barbara Cosgriff sent Roland Schatz a draft agreement covering the Medco media analysis project. The proposed agreement was drafted by in-house Medco attorneys. In section 1 of the draft, Medco requests a Status Quo Analysis covering all of Europe. In Section 4 of the draft, Medco uses the figure of "€17,500 per month ... in respect of the Status Quo Analysis...." This repeats exactly the €17,500 per month price quote for the Europe-wide Analysis found in Media Tenor's November 10, 2009 letter to Ms. Cosgriff. See **Exhibit B**.

32. Media Tenor did not have an attorney review the draft agreement produced by Medco's attorneys. Roland Schatz reviewed the draft and proposed some slight changes, but nothing was signed.

33. On or about December 17, Ms. Cosgriff agreed to a 12 month period for the Europe-wide Status Quo Analysis.

34. Thereafter, on or about December 18, and prior to the signing of any agreement, a team of 15 Media Tenor analysts began diligently working on the Status Quo Analysis. They continued working in the absence of a signed agreement. The media research and analysis was overseen by Roland Schatz.

35. Barbara Cosgriff and others at Medco knew that Media Tenor was diligently working on the Status Quo Analysis without a signed agreement. During December 2009 and January 2010, Medco's Barbara Cosgriff and other Medco officers knew that Media Tenor was performing a 12 month, Europe-wide Status Quo Analysis, and did not protest that such

work was being performed for Medco. Medco also knew, pursuant to discussions and Media Tenor's November 10, 2009 letter (**Exhibit B**) that the fees for a 12 month, Europe-wide Status Quo Analysis was €17,500 per month of analysis.

36. During November and December 2009, and through January 21, 2010, Medco and Media Tenor were in regular contact via emails, telephone calls, and face to face meetings, including a January 8, 2010 meeting in Zurich. From November 5, 2009 through January 21, 2010, the working relationship between Media Tenor and Medco was excellent.

37. The Agreement was actually signed on January 21, 2010. Please see **Exhibit A**.

38. Between January 26-30, 2010, Ms. Cosgriff attended the Davos World Economic Forum with Mr. Schatz.

## The Agreement

39. In section 1 of the Agreement, pursuant to its duty to perform "Services" as defined at page 1 of the Agreement, Media Tenor was to perform the previously discussed Europe-wide, 12 month Status Quo Analysis, in order to analyze Medco's past media coverage, and to develop goals for 2010. The Agreement further stated that Media Tenor would present the first results of this Status Quo Analysis no later than 3 weeks after signing the Agreement.

40. As described in the Agreement, and pursuant to the pre-Agreement working relationship between Media Tenor and Medco, when Medco knew that Media Tenor was working for Medco absent a signed contract, it is clear that two types of Media Tenor "Services" would be performed. The first was a Europe-wide Status Quo Analysis covering 12 months -- January 2009 through December 2009. This work began on or about December 18, 2009 in the absence of a signed agreement. See also Agreement, **Exhibit A**, section 1.

The second and subsequent Service would commence in January 2010, and would be Media Tenor's monthly reports to Medco that would "strategically plan, manage and control" Medco's 2010 media coverage. See **Exhibit A** at section 1.

41. Pursuant to section 4 of the Agreement, payments for Media Tenor's Services were to commence in January 2010, and would be: (1) $25,000 per month of analysis in the Europe-wide, 12 month, Status Quo Analysis requested by Medco, and (2) $25,000 per month to "strategically plan, manage and control" Medco's 2010 media coverage. In the Agreement, the parties used $25,000 per month concerning the Status Quo Analysis, as this figure was, given currency values (i.e., euro vs. the dollar), a close approximation to the €17,500 price quote: (1) offered by Media Tenor in its November 10, 2009 letter to Medco, see **Exhibit B**, and (2) found in Medco's December 16, 2009 draft agreement.

42. The relevant text of Section 4 states: "commencing with the month of January, 2010, a retainer fee in the amount of $25,000 per month, pro-rated for any partial month, in respect of the Status Quo Analysis *and* ongoing monthly monitoring and reporting with respect to 100 opinion leading media in Germany and Europe." Emphasis added. The text goes on to say that the so-called "retainer fee" was not a pre-paid fee, but a fixed fee amount that "will be paid monthly in arrears." Agreement at section 4.

## The February 15, 2010 Invoice

43. On February 13, 2010, Media Tenor presented its Status Quo Analysis to Medco executives, including Barbara Cosgriff, in Washington D.C. None of the Medco executives present raised the issue of cost or the fact that a 12 month, Europe-wide Analysis had been performed. The reaction to the presentation was very positive. The Medco executives were excited and grateful for the media issues revealed.

44. Medco accepted Media Tenor's Status Quo Analysis without protest.

45. After completing the Status Quo Analysis and presenting the results to Medco, a February 15, 2010 invoice was sent to Medco for $300,000. The invoice is attached as **Exhibit C**. The invoice reflected the agreed-upon $25,000 fee per month of analysis (12 months of 2009, times $25,000).

46. The invoice, **Exhibit C**, was sent by Media Tenor Ltd., and contained instructions on how to transfer funds to MTL's New York account at Chase bank. The invoice was sent by MTL, Media Tenor's New York subsidiary, because Medco requested, for the sake of efficiency, speed, and cost, that it be able to pay in dollars, to a U.S. account. Medco stated to Mr. Schatz that wiring funds to Switzerland was burdensome for Medco.

47. As a courtesy to Medco, Mr. Schatz agreed to Medco's request, such that Medco would receive invoices from MTL, and could efficiently pay a New York bank in dollars. As a result of Medco's request, and Media Tenor's agreement with Medco, all invoices were sent from MTL, for payment to a New York account at Chase.

48. No one at Medco ever disputed the $300,000 invoice (**Exhibit C**) in any way.

49. Medco never paid the $300,000 invoice. However, as described in subsequent paragraphs of this Amended Complaint, in March 2012, Medco admitted it owed the $300,000, and several attempts were made to send a check, or wire the sum, to Media Tenor.

50. Section 4(B) of the Agreement states: "All payments made pursuant to this Agreement will be net payment due and payable within thirty (30) days after Medco's receipt of an undisputed invoice from Professional."

51. After receiving the February 15 invoice, Medco did not dispute it, and did not pay within 30 days. Accordingly, pursuant to the Agreement itself, Medco breached the Agreement and must pay the $300,000 reflected in the undisputed invoice.

52. Medco made some of the agreed-upon monthly $25,000 payments, covering Media Tenor's media "planning, management and control" services performed in 2010. However, the first payment did not arrive until June 2010. As agreed between the parties, and as requested by Medco, the payments Medco did make, were made to the MTL account at Chase bank in New York.

### Media Tenor's Work Through October 2010

53. On July 15, 2010, Mr. Schatz and Ms. Cosgriff met in Brussels to create a plan and agenda for the rest of the year.

54. Medco terminated the Agreement on or about September 3, 2010. Under the Agreement, this triggered a 30 day notice period in which work continued.

55. Media Tenor continued performing its duties for Medco after October 3, 2010, because Medco requested, in signed writings, including emails, Media Tenor's services, through the end of October 2010. These requests to extend the Agreement came from Medco's Europa Apothek and from Barbara Cosgriff.

56. Klaus Gritschneder of Europa Apothek requested data from Media Tenor in October 2010. Mr. Gritschneder then met with Media Tenor's CEO, Roland Schatz later in October 2010, and received Media Tenor's report.

57. Medco's Barbara Cosgriff, sent Mr. Schatz an email dated July 26, 2010, which requested additional ideas, and requested that he send information concerning an Agenda

Setting Conference. Media Tenor's Agenda Setting Conference took place from October 27 through October 29, 2010.

58. Media Tenor's October 2010 services, performed through October 31, 2010, were accepted by Medco without protest.

59. In addition to the $300,000 discussed previously, Media Tenor, despite many requests for payment, has not been paid its $25,000 Services amounts for the months of July 2010, August 2010, September 2010, and October 2010.

60. Medco did pay for prior months.

61. Medco accepted all of Media Tenor's Services without protest.

## Medco's Written Admissions

62. The parties have communicated in the past, concerning payments Medco owes to Media Tenor.

63. After the communications, Medco agreed to pay Media Tenor the $300,000 for the Status Quo Analysis.

64. On March 28, 2012, Peter Harty, whose position at Medco was Vice President, Government Affairs, emailed Roland Schatz, the CEO of Media Tenor, with a copy to Medco's audit department, stating: "Roland, you should have received a check for the outstanding invoices ($300,000+) by now. I know the paperwork was submitted to our accounts payable dept [sic] weeks ago." Medco's March 28 email is attached hereto as part of **Exhibit D**.

65. Media Tenor wrote back to Mr. Harty stating that it had not received the check.

66. On March 29, 2012, Peter Harty wrote in relevant part to Mr. Schatz that "the money was to be wire transferred .... But we're tracking it down and will get it on its way as soon as

we can. Thanks for your patience." Medco's March 29 email is attached hereto as part of **Exhibit D**.

67. The $300,000 that Medco admits is owed to Media Tenor has not been paid to Media Tenor.

68. Pursuant to section 4 of the Agreement, Medco owes Media Tenor $9,800 for a workshop called "2010 Communication Plan."

69. The $9,800 is also reflected in the February 15, 2010 invoice (**Exhibit C**).

70. Medco stated it would pay for the Plan but has never done so. In a September 12, 2012 letter from its post-merger counsel, Medco admitted that it owed Media Tenor $9,800 for the Plan. Despite its attorney's statement that the sum is owed, Medco has not paid Media Tenor this sum.

71. In the September 12, 2012 letter from its post-merger counsel, Medco also admitted that it owed Media Tenor $25,000 for August 2010 and $25,000 for September 2010, in the amount of $50,000. This sum has not been paid to Media Tenor.

72. In the September 12, 2012 letter, Medco also admitted that it owed a pro-rated amount concerning October 2010, in the amount of $2,419. This amount covered October 1 through 3. This sum was never paid.

## COUNT I – BREACH OF THE PROFESSIONAL SERVICES AGREEMENT

73. Plaintiffs repeat, reiterate and reallege paragraphs 1 through 72.

74. As stated herein, despite: (1) Medco's knowledge, already acquired in November 2009, that the Status Quo Analysis would cost €17,500 per month, (2) Media Tenor's numerous demands for payment, (3) the fact that Medco never disputed the February 15, 2010 invoice of $300,000, plus the workshop sum of $9,800, and (4) the March 2012 written

admissions from a Medco officer (Mr. Harty) that the $300,000 sum is due, Medco has failed to pay the $309,800 invoice dated February 15, 2010. See **Exhibit C**.

75. At all relevant times, Media Tenor performed its contractual duties.

76. At all relevant times, Medco accepted without protest, Media Tenor's services.

77. Due to Medco's breach concerning payment for Media Tenor's Status Quo Analysis, Media Tenor has been damaged in the amount of $300,000, plus applicable interest.

78. Pursuant to the Agreement, section 4(B), all undisputed invoices were to be paid within 30 days. Medco breached the Agreement because it received the February 15, 2010 invoice for $309,800, did not dispute the invoice, and then did not pay within 30 days.

79. Pursuant to the Agreement, section 4, Medco owes Media Tenor $25,000 for its services planning and managing Medco's 2010 media coverage for July, August, September and October of 2010. As stated previously, Medco admits it owes $50,000 for August and September of 2010. But Medco also owes $25,000 for July 2010 and $25,000 for the month of October, as Media Tenor, at Medco's specific written requests, worked for Medco throughout the full month of October.

80. Due to Medco's breaches concerning July, August, September, and October 2010, Media Tenor has been damaged in the amount of $100,000, plus applicable interest.

81. As stated previously, counsel for Medco admitted that Medco owes $9,800 for the cost of a workshop on "2010 Communication Plan."

82. Medco has not paid Media Tenor the $9,800. The $9,800 for the workshop was included in the February 15, 2010 invoice (**Exhibit C**). Medco never disputed the invoice.

83. By making several partial payments required by the Agreement, under New York law, Medco has acknowledged that all other payments called for in the Agreement are valid and due.

84. Pursuant to Medco's breach of the Agreement, Media Tenor has been damaged in the amount of $409,800; consisting of:

   (i)     $300,000 with respect to the Status Quo Analysis;

   (ii)    $100,000 for payments due for July, August, September and October 2010;

   (iii)   $9,800 for the workshop (2010 Communication Plan).

### COUNT II – BREACH OF CONTRACT (MEDIA TENOR LTD.)

85. Plaintiffs repeat, reiterate and reallege paragraphs 1 through 72.

86. In the alternative, pursuant to Rule 8(d)(2), as the invoices for services sent to Medco, per Medco's request, were from MTL, and since the invoices requested that payments be made to MTL's Chase account in New York (as Medco requested), Plaintiff MTL seeks damages for breach of contract.

87. MTL sent the February 15, 2010 invoice in the amount of $309,800, covering the Status Quo Analysis, and $9,800 for the workshop fee (**Exhibit C**). Medco never disputed or protested the invoice. It has not been paid, causing MTL damages of $309,800.

88. MTL sent the invoices covering the media planning and management work for July ($25,000), August ($25,000), September ($25,000) and October 2010 (25,000). Medco never disputed or protested the invoices. All four have not been paid, causing MTL damages of $100,000.

89. Medco did pay MTL $25,000 for media management services for prior months.

90. Pursuant to Medco's breach of contract, MTL has been damaged in the amount of $409,800; consisting of:

    (i)    $300,000 with respect to the Status Quo Analysis;

    (ii)    $100,000 for payments due for July, August, September and October 2010;

    (iii)    $9,800 for the workshop (2010 Communication Plan).

## COUNT III – ACCOUNT STATED

91. Plaintiffs repeat, reiterate and reallege paragraphs 1 through 72.

92. On February 15, 2010, Media Tenor sent an invoice for its services (described in detail herein) in the amount of $309,800 (**Exhibit C**). Thereafter, Media Tenor sent four invoices to Medco, each for $25,000, for media monitoring services provided to Medco in July, August, September and October 2010 (for a total of $100,000).

93. The invoices were based on prior transactions and dealings between Media Tenor and Medco, namely the work (described in detail herein) on the Status Quo Analysis, the workshop concerning a 2010 communications plan, and Media Tenor's 2010 media monitoring services. All of these services were requested and accepted by Medco without protest. At all times, Medco knew that Media Tenor was performing these services.

94. Media Tenor performed all of its work for Medco in good faith and with Medco's full knowledge and encouragement.

95. After receiving the February 15, 2010 invoice (**Exhibit C**), and the four subsequent invoices, each for $25,000, Medco kept each of them without objecting to any of them, at any time.

Accordingly, Media Tenor demands $409,800 for account stated.

## COUNT IV – ACCOUNT STATED (MEDIA TENOR LTD.)

96. Plaintiffs repeat, reiterate and reallege paragraphs 1 through 72.

97. In the alternative, pursuant to Rule 8(d)(2), as the invoices for services sent to Medco, per Medco's request, were from MTL, and since the invoices stated that payments be made to MTL's Chase account in New York (as was desired by Medco), Plaintiff MTL brings a cause of action sounding in account stated.

98. On February 15, 2010, MTL sent Medco an invoice for services (described in detail herein) in the amount of $309,800 (**Exhibit C**). Thereafter, MTL sent four invoices to Medco, each for $25,000, for media monitoring services provided to Medco in July, August, September and October 2010 (for a total of $100,000).

99. The invoices were based on prior transactions and dealings between Media Tenor and Medco, namely the work (described in detail herein) on the Status Quo Analysis, the workshop concerning a 2010 communications plan, and Media Tenor's 2010 media monitoring services. All of these services were requested and accepted by Medco without protest. At all times, Medco knew that Media Tenor was performing these services. Medco then requested, for its convenience, that it be billed by MTL.

100. Media Tenor performed all of its work for Medco in good faith and with Medco's full knowledge and encouragement.

101. After receiving the February 15, 2010 invoice (**Exhibit C**), and the four subsequent invoices, each for $25,000, Medco kept each of them without objecting to any of them, at any time. Accordingly, MTL demands $409,800 for account stated.

## COUNT V – BREACH OF CONTRACT CONCERNING STATUS QUO ANALYSIS

102. Plaintiffs repeat, reiterate and reallege paragraphs 1 through 72.

103. As described herein, Media Tenor started work on the Status Quo Analysis on or about December 18, 2009, before it signed any agreement, and at all relevant times, Medco knew the Status Quo Analysis work was being performed, was kept abreast of the work being performed, and desired that Media Tenor complete and present to it a Status Quo Analysis.

104. In the alternative, pursuant to Rule 8(d)(2), with respect to the Agreement, Section 4 of the Agreement is ambiguous. Section 4 does not provide the payment terms for Media Tenor's work on, and completion of, the Status Quo Analysis. Section 4 covers the payments due for "future monthly monitoring and reporting," but not payment for work on the Status Quo Analysis itself. When the parties signed the Agreement on January 21, 2010, the payment terms concerning the Status Quo Analysis work were complete, and already considered complete by the parties.

105. A contract can be demonstrated by the objective manifestations of the intent of the parties as gathered by their deeds. By December 17, 2009, Medco informed Media Tenor that it wanted a 12 month, Europe-wide Status Quo Analysis. By its deeds and silence, Medco accepted the payment terms contained in Media Tenor's November 10, 2009 offer letter (**Exhibit B**). Beginning on or about December 18, 2009, Medco accepted the terms of Media Tenor's offer letter by its silence and by accepting and encouraging the work performed by Media Tenor on the Status Quo Analysis, in the absence of a signed agreement. Medco's actions in November and December 2009, and January and February 2010, concerning the Status Quo Analysis, support the conclusion that Medco accepted the November 10, 2009 terms concerning Media Tenor's fees for the Status Quo Analysis, by its silence, and by accepting the work performed by Media Tenor.

106. Media Tenor demands damages for breach of contract concerning the Status Quo Analysis in the amount of €210,000 (€17,500 times 12 months). This Count is separate and unrelated to (1) the $100,000 demanded in Counts I through IV, for monthly media monitoring payments due for July, August, September and October 2010, and (2) the $9,800 workshop fee also demanded in Counts I through IV.

## COUNT VI – QUANTUM MERUIT

107. Plaintiffs repeat, reiterate and reallege paragraphs 1 through 72.

108. As described herein, Media Tenor started work on the Status Quo Analysis on or about December 18, 2009, before it signed any agreement. At all relevant times, Medco knew the Status Quo Analysis work was being performed, was kept abreast of the work being performed, and desired that Media Tenor complete and deliver to it a Status Quo Analysis.

109. In the alternative, pursuant to Rule 8(d)(2), with respect to the Agreement, Section 4 of the Agreement is ambiguous. Section 4 does not provide the payment terms for Media Tenor's work on, and completion of, the Status Quo Analysis. Section 4 covers the payments due for "future monthly monitoring and reporting," but not payment for work on the Status Quo Analysis itself.

110. Media Tenor's performance of services on the Status Quo Analysis was done in good faith, absent a signed contract, and with Medco's full knowledge that Media Tenor's regular fee for such services was €17,500 per month of analysis. See for example **Exhibit B**.

111. Media Tenor researched, drafted and completed the Status Quo Analysis on behalf of Medco. Medco readily accepted Media Tenor's Status Quo Analysis.

112. Media Tenor had a reasonable expectation that it would be reasonably compensated for the services it performed in researching, drafting and completing the Status Quo Analysis.

113. Media Tenor, pursuant to quantum meruit, demands the reasonable value of its services in researching, drafting and completing the Status Quo Analysis. Media Tenor claims the reasonable value of these services is $300,000. This Count is separate and unrelated to (1) the $100,000 demanded in Counts I through IV, for monthly media monitoring payments due for July, August, September and October 2010, and (2) the $9,800 workshop fee also demanded in Counts I through IV.

**WHEREFORE**, Plaintiffs respectfully demand that judgment against Medco be entered as follows:

**On Count I**, brought by Plaintiff Media Tenor and sounding in breach of the Professional Services Agreement, contract damages of $409,800; consisting of three subparts: (1) $300,000 with respect to the Status Quo Analysis; (2) $100,000 for payments due for July, August, September and October 2010; and (3) $9,800 for the 2010 Communication Plan; together with interest at 9% per annum pursuant to CPLR 5001 and 5004.

**On Count II**, brought by MTL and sounding in breach of contract, contract damages of $409,800; consisting of three subparts: (1) $300,000 with respect to the Status Quo Analysis; (2) $100,000 for payments due for July, August, September and October 2010; and (3) $9,800 for the 2010 Communication Plan; together with interest at 9% per annum pursuant to CPLR 5001 and 5004.

**On Count III**, brought by Plaintiff Media Tenor sounding in account stated, $409,800; together with prejudgment interest at the maximum rate allowed by law.

**On Count IV**, brought by Plaintiff MTL sounding in account stated, $409,800; together with prejudgment interest at the maximum rate allowed by law.

**On Count V**, brought by Plaintiff Media Tenor, sounding in breach of contract concerning the Status Quo Analysis, €210,000; together with prejudgment interest at the maximum rate allowed by law.

**On Count VI**, brought by Plaintiff Media Tenor, sounding in quantum meruit concerning the Status Quo Analysis, the reasonable value of services that produced the Status Quo Analysis, which Media Tenor states is $300,000; together with prejudgment interest at the maximum rate allowed by law.

Such other, further and different relief as this Court deems just and proper.

Dated: December 13, 2013.

Wuersch & Gering LLP
*Attorneys for Plaintiffs Media Tenor Int'l AG
and Media Tenor Ltd.*

By: _____
Jorn A. Holl (JAH 1119)
100 Wall Street
New York, NY 10005
212.509.5050
jorn.holl@wg-law.com